We have our 1 o'clock, 4-10-0-1-2-0, Pioletti versus O'Donnell et al. We have for the appellant, Stanley Wasser, and for the appellee, Ann Cholstrom. Afternoon. I apologize, we're a few minutes late getting back from lunch. We had a little difficulty with the bill. Mr. Wasser. May it please the court, counsel, Stanley Wasser for plaintiff appellant Nancy Pioletti. Bottom line, Nancy Pioletti is asking the court to find that the Board of Review clearly erred when it found that her actions constituted insubordinate conduct of such a deliberate and willful nature as to disqualify her on grounds of misconduct from receiving unemployment benefits. And therefore, we're asking the court to reverse, to remand it back to the trial court so the trial court can reverse, with the rest of the trial court to reverse and then order the board, or the department as the case may be, to award her the benefits that she is due. I want to go directly to what I suggest to the court are the key parts of the record which if you examine them, will show you that the Board of Review clearly erred in making the factual findings that were the predicates for its ultimate decision. And its ultimate decision, which is in, the decision shows up in appendix A1 of our brief. And A2, the next to last big paragraph, is where the board finally reduces all of its findings down. And toward the end it says, in the instant case the evidence presented supports a finding that, and it identifies two things, failure to discuss and the abuse of language. But the key parts of the record I'd like the court to focus on is, and this is the transcript of where the testimony was taken by phone conference with the hearing referee. It's page 92, 100, and 101. This is where Mr. Lovelace, the supervisor, is testifying. And then 108, where my client, Ms. Poletti, provides testimony. These are, if you'll permit me a moment to go through this, I think you'll see what the basis of our argument is. On 92, which is, I think it's page 11 marked in the transcript, and it's got the underlying trial court record number 71 on it, I think I've got the right page, it's 92 in the appellate record. Mr. Lovelace is giving testimony. He first says that he asked his administrative assistant to contact Ms. Poletti to discuss a disciplinary issue. He said he got on the phone and told her, I need to discuss a disciplinary issue regarding activity on your bus. And that's when he said Ms. Poletti made the statement, and that was, and I'll use the word, BS. That was BS. And hung up the phone. And then he's asked by his attorney, by the employer's attorney, did you call her back? What happened? He said, I didn't call her back. I was going to give her a chance to calm down. I hoped she would call me back. And on the next page he says, she never followed up. But when I pressed him at pages 100 to 101, asked him about what he was saying, you notice that he said he didn't recall that he had called her back and to come in earlier. And did he recall that she came in that afternoon? He hesitated and said, that's possible. I don't recall, but I think she came in. So I asked him specifically that Ms. Poletti's recollection, which she ends up testifying to at 108, that she came in at 1 o'clock as directed. Do you have any reason to doubt that? He said, no, I don't. And I said, when you came in, you were present, and Ms. Micas, his assistant, was present. He acknowledged that. And Ms. Poletti was present. He acknowledged that. And that she apologized. So, and Ms. Poletti at 108 says that's exactly what happened. But she says, the initial call I got from Ms. Micas, as Mr. Lovelace then says at page 98, was really to contact her about coming in to drive a bus. They needed additional drivers. She was coming back off of this personal leave that she had. So she was faced, as she said, and we've argued, she often had a very frustrating personal problem. She was contacted to come back. She thought she was coming back. The phone conference changed. The matter of a disciplinary matter came up. She made her statement, which I'll address in a second. And then she, in fact, did come in. So if you look at what the Board of Review said, they said their key findings were what? They said she repeatedly uttered the words. Well, we know she didn't because the uncontradicted record was that she said it once and Lovelace, her supervisor, said, I asked her to repeat it. So she did exactly what her supervisor said. So the fact that this is, the Board felt that it was some kind of repetitive statements here is clearly wrong. Secondly, the Board states that she did not come in to discuss the disciplinary matter. What's uncontradicted from Mr. Lovelace's own testimony, that, in fact, she did come in. And Mr. Lovelace never said, there's no evidence presented by the employer, that at this meeting they went to discuss the disciplinary matter with her. In fact, what he said was, I told her, I'm now going to terminate you, recommend termination, because of what you said to me on the telephone. So the matter, there was no discussion because there was nothing brought up to discuss. And there's no facts in here, and where the Board comes to that conclusion, not only of not meeting, but not meeting to discuss. I would suggest it's just clear error. It just is not... The record shows nothing with respect to what the basis for the discipline was, other than the word bullshit. Is that correct? The record of what the discipline was, or was going to be? What was it for? What she had done? That's correct, Your Honor, in that Mr. Lovelace said he never conveyed what it was about. And Ms. Colletti said she didn't know what it was about. All she knew was that it was a disciplinary matter. And Mr. Lovelace, in giving his testimony, sort of the background, he was asked, well, why were you going to address this to her, something he did not convey to her, and said, well, we had had problems on her bus that came to a head with the substitute that was driving in the last couple of days. So nothing in the back and forth between Mr. Lovelace and Ms. Colletti did he convey what it was about. It just... And she said, I never knew what it was about. And she said, I never even got the form, whatever this form was. There is a point made... I want to turn in a second to the abuse of the profane language directed part. But there's an argument made in the stakes brief that somehow adds another piece of conduct that they claim was the basis for the decision here, which is that Colletti hung up on her supervisor. Well, the first thing I think that totally belies that that was, in fact, part of it, is what I said. If you look at what the board said at the second page of its decision, which is in appendix two, in the instant case the evidence presented supports a finding that, and identifies two things, failed in her duty to discuss the disciplinary matter with her director of operations, and then when asked uttered the profane language. The board never said that there was some other factor. They found that the phone that she hung up, but they never said that was some kind of insubordinate conduct. In fact, Mr. Lovelace never said the phone call was cut short. He never said she slammed the phone down. They all just said she hung up. In fact, she said, and there's nothing in the record that contradicted it, she said, I said, well, then I'll see you at 2.30, and hung up. And the callback was, can you come in at 1 o'clock? So that part, I think, is not even in the board's decision. Now, what about the words? The board says, she uttered, the board said it was abusive and profane language directed toward her supervisor. Does the record show this? No, it doesn't. I think you can see there's clear error here. The phrase she uttered was hardly profane under any reasonable definition of the term. The state doesn't even argue that it's abusive. They just argue that it's profane. It's not vile. It's not vulgar. It's not contemptuous of something sacred. Any measure of modern parlance of what profane is, and if you look at the Second District Carroll case, there the words were, I don't need to hear this BS from you, and although the argument was there that it was, before it got to the appellate court, was profane, the appellate court didn't even label it as profane. They just said, well, it's moderate. So they didn't even recognize that kind of language as being profane. Likewise, I would suggest it can hardly be said in any manner reasonably that this phrase was abusive. Abusive would imply that somehow it was directed too personally to her supervisor. But this was the phrase, this is BS, not intimidating, not derogatory, not provoking back to her supervisor, not even personal to her supervisor. And we cited you in the Green Law case where the employee says to the supervisor, you can kiss my grits. I mean, clearly it's a directed personal attack, abusive attack to the supervisor. And look at the Manning case where, unfortunately, the employee was leaving very, using F word, messages on all kind of other co-workers' phones because the employee was so upset. Now, was it directed to her? What is the basis for the drawing of that conclusion by the board? I would suggest that when you look at this context of what happened here, particularly now that you know it wasn't repeated, she did come into the meeting, it wasn't a directed, it wasn't a rejection of a reasonable direction. Look at the Green Law case first for comparison. The employee in Green Law, when asked, when had the discussion with the supervisor, immediately says, you can kiss my grits, and the supervisor says why? Signed it, starts to walk out of the office. Signed this exit form, and the employee just walks out of the office in the presence of two supervisors, one who wasn't even doing the talking to her. And look at Carol. Carol, the employee, says to the new boss, I don't need to hear this from you. If you want to fire me, go ahead and fire me. And then she fires him, and he says, you don't have the authority to fire me. Challenges directly, and I also cited your Virginia Piggly Wiggly case, clearly showing a rejection. You got a direction to do something, you are full of blank. I mean, it was clear rejection. Poletti never said she was not going to come in to the office. She vented her frustration, which I'll talk about in a moment. She uttered an ambiguous phrase, this, which I suggest is the context of what happened here. She had personal problems, then she thought she was going back to work, then she hears about a disciplinary situation. She said, I lost it, I became emotional. In fact, she came in and met. So how can this board, how can this not be clearer by this board to say, she never met, she never came to this class, and she was rejecting a reasonable duty to do something, rather than being a willful refusal to submit to reasonable authority, which is really where the board was pointing its finger in this one. This case, as we pointed out in our brief, it's the very kind of private conversation that is cited by all the other appellate cases that we gave you that are not misconduct. It's a single private conversation with her supervisor. Nobody even said she raised her voice, so nobody even said it was argumentative, but even the other cases say, even if you're argumentative, even if you have a flurry of temper, a single private conversation, no profane language, no abusive language, no threatening language, no refusal to obey a directive, she came in, and no prior warning, which is a thumb on the scale that the Carroll Court found. This is rather a case of an employee who when you really look at this, you look at it as a whole, which you can now do, she exercised poor judgment, and she exercised, she expressed her frustration about the circumstances, her surprise about being apparently the subject or being involved in some matter of a disciplinary matter, coming up after hearing she was going to be returning to work after some personal problems. I would suggest to you that the language of this is BS, that she uttered under this circumstance is nothing more than the equivalent of a phrase, you're kidding. She could have said, you're kidding. But she wasn't saying, I'm not doing something, because she in fact did it. She didn't repeat it, she only said it once, and she didn't really throw it in her employer's, her supervisor's face. It was over the phone, first of all, and it was not directed to what the supervisor said. So if you look at this, the board, not only have they ignored the facts, and I think there's clearer in how they even found the facts, and even, I guess, under the somewhat fuzzy standard of clear that we are dealing with, even if you looked at it under a mask and said, well, I have to at least judge it as some kind of manifest weight standard because I have to give some deference to the agency, I have to give some, I have to give deference that there's support because then I have to prime a question that's true and correct. But even under that, none of this, there's nothing in the facts that bear that out. Everything is the other way. And so, in doing so, the board didn't even take into consideration the context of what happened. In fact, when you read the decision, there's no analysis. You can't even find how they reason to the conclusion they reason. It's just that they jump to a conclusion that was not supportive on the record. Okay? I apologize for sounding puritanical, but B.S. to me does seem to be profane. I understand what the Piggly Wiggly case apparently stands for. Are there any other cases that support the lack of profanity? Well, I think the only case that I saw that directly addressed it was the Carroll case where they actually made a comment about how they viewed the language. Because most of the other cases they didn't have that kind of language in there. And, or, is it where I think anybody was saying it was profane? I mean, it's the only one really that was the Manning case. The Manning case did, because the Manning case was the F one. And the employee, he was even upset about their fellow employees who was leaving messages and yelling in the hallways, but the messages which somehow got back to the workplace had the F word. So that clearly drew a standard. I mean, I think we all would say that's profane because that's vulgar and vile. Is the board's decision correct when it said the claimant never met the employer's director of operations to discuss the disciplinary matter? No, it's not. And for the reason I stated before, two things. One, when I asked Mr. Lovelace after he said that she didn't come in at 92, for the record, when I asked him, he admitted that she came in. He had no reason to doubt her statement that she came in. And in fact, he said he was there, Ms. Micas was there, Pauletti was there and apologized. So clearly, she came in and met to discuss. He never said anything other than, well, I said I'm going to have to recommend you for termination because of what you said. There never was a discussion. It never came back up. That's just ignored by the board at all. And nowhere did Ms. Pauletti say, I'm not coming in. She didn't walk out, for example, as the Green Law employee did. There was no clear rejection to it. This was just, I would suggest, a very, you know, she made it an ambiguous outburst. It may have risen to the level of, as it did, obviously, in subordination to terminating. But it didn't rise even by itself. Let's say you put aside all the other things. Because there is a case law that says, you know, words by themselves could be, but in this, when you look at these words, and certainly you look at the context level, these words by themselves, I would suggest, do not rise to the level of misconduct, which requires some kind of deliberate and willful. This was just, she had an emotional expressive outburst, like an interjection, like, you're kidding, when she heard these words. But she said, I'll see you at 2.30. And he calls back and says, well, you need to come in at 1. She comes in at 1. So she did not, by any stretch of the imagination, do what really is the point and the main push of the board's decision. In subordination, refusal to submit to reasonable authority. And they were looking at both the words and her not coming in. Well, she came in, and I would suggest that the words were just ambiguous at this point. They're not like the words that the courts have found to be. And I think the interpretation of the statute requires that there be something more for the, even though it's misconduct, and she's got to live by that standard, but I think when you look at the case law, it's sort of clear that the statute is not generally construed to start giving expansive definitions to swallow up what rights there are in the statute. And at least from the cases that we have, it doesn't come anywhere close to the Green Law or the Manning or even the Carroll case that they found was a key factor. If you look at the Carroll case, the real key thing in the case law is that the court saw that it took a lot more than just the B.S. statement. And I think that was consistent and proper. So I think in this case, when you look at all this, it's clear errors. Predicates are not there that support it. And the analogy that Carroll is not there, and when you really examine the context, which is what all the cases really do, they examine the context. This is a simple case of a private conversation, ambiguous statement. She didn't reject anything. She didn't say abusive threatening or profane language. We ask that you reverse thinking. Thank you. Ms. Chalstrom. Good afternoon and may it please the Court, Assistant Attorney General Anne Chalstrom. The Board of Review did not clearly err in determining that Pialetti committed employment-related misconduct by engaging in multiple successive insubordinate acts, which rendered her ineligible to receive unemployment benefit. What were the consecutive insubordinate acts shown by this witness? First, in response to her supervisor's request to report to work early to discuss a disciplinary matter and to sign a disciplinary action form, she twice stated, quote, this is bullshit. She said it twice. She uttered it the first time and then when Mr. Loveless said something to the effect of what did you say, she said the statement again. She repeated the statement and that's what the board found. Does the record show anywhere in there what the word bullshit meant? No, just that she uttered those specific words. Was that important to know what it was? If it was a discipline, what it was? Well, Mr. Loveless said it was a disciplinary matter resulting from activity on her bus. Does the record show that he told Pyle anything? No, she hung up on him once she uttered that this is bullshit comment. She hung up on him. And do you disagree that she did come in early the next day or the Thursday? At some point she did come in and met with Loveless, although Loveless confirmed, and I'll refer the court to the page number, it's at C93, which I believe is Loveless's testimony, though she eventually met with him in person and I believe he acknowledged, apologized to him for the comment, she never followed up with him to talk about the disciplinary issues about which he had contacted her either by phone or in person at that point. Whose responsibility would that be? That wouldn't be his responsibility to tell her this is why we're here? I don't know whose responsibility it is at that point. Well, they're the ones that are imposing the discipline. I would think they would tell the employee this is what you did wrong. But isn't the reason that they didn't get that far because they decided to fire her after the phone call? That's correct. So she wasn't fired on the basis of the discipline he wished to speak with her about. She was fired because she made the statement and hung up the phone. But I guess my point is once they made that decision to terminate her, how can you then use her failure to follow up on the original decision to fire her? I think if you wish to disregard that third point that the Board of Review noted as far as an additional compounded instance of misconduct, you still have two, either of which by themselves are certainly compounded, would be enough. Two would be in response to the supervisor's directive. I think that's an additional thing. I think the Board pointed this out. If not, we pointed it out in our brief. Any one of these things alone, just making the statement in response to the supervisor's directive would have been enough. What was the testimony with respect to her hanging up the phone? I thought Mr. Wasser said the record doesn't reflect that she hung up in anger on him, that she simply hung up the phone. I can point the court, according to Loveless, to pages C-92 and C-100. Loveless testified that she made the statement and hung up the phone. I don't know that you can really slam a phone anymore with the technology we have these days. He testified she hung up the phone on him and she testified she didn't remember. At that point, the Board of Review is the fact finder and if there is a question of fact, it is a question of evidence. At the very most, there was a question of fact on that point. Once again, can you tell me what happened when she did report to Mr. Loveless? Loveless testified that it was his recollection that she did make some sort of apology to him. Still, he never told her what she was in it for. The record doesn't reflect that. Is that important? I don't know. The fact that she could have also brought it up, the fact that it could have been discussed over the phone, yet she hung up on him after she was advised of this. I don't know that where to place the blame on whose responsibility it was to bring it up affects the determination that it wasn't discussed, it wasn't engaged in by her and discussed. If you terminate somebody, wouldn't it be your responsibility to tell them why? I don't know that you have to give a reason for termination. I don't know that a reason for termination has to be given. Of course, here, I'm not representing the employer, I'm just representing the state, the Board of Review and the decision maker, based on the findings, whether these actions constituted misconduct under the Act, which made her ineligible for unemployment benefits, not whether her discharge was proper or not. So how do we reconcile the phone conversation and maybe a hang-up with these cases that Mr. Wasser cited? The cases, um... Let me ask you a preliminary question. Is it in the record what she was referring to when she said this is bullshit? What happened on the bus before is, I assume, what she's referring to. Her comment was made in response to Loveless telling her, you need to come in early to discuss a disciplinary matter resulting from activity on her bus and to sign a disciplinary action form. And she admitted that her statement followed that statement. What happened on the bus? What the problem was? The problem was, of course, she was out that day from work for the personal reasons. The record does reflect, I'll point the court to C-78, 92, and 95. A substitute bus driver had apparently driven for her that day or the prior day and noted the lack of discipline on the bus with the children. And Loveless had testified that there was a lack of discipline and safety on the bus. So that was the underpinning that prompted the disciplinary measure against her. Lack of discipline and safety on the bus. She had not managed the discipline on the bus. I used to be a substitute teacher. There was always a lack of discipline regardless of how strict the teacher actually was. You're saying she was going to be disciplined because the children were out of line when she wasn't there? Apparently she had had prior warnings on this matter. I think the substitute bus driver was talking about C-78, 92, and 95. I'll refer the court. There are documentary exhibits submitted by the employer regarding the Pialetti's prior history, employment history, as well as testimonial evidence. Apparently this lack of discipline and safety on the bus was a recurring theme and corrective actions had not been considered. I think the document regarding this instance was issued as a final warning to her. But those prior issues have nothing to do with cause for discharge here? I mean, we're not to consider them? The district didn't state that that's why they discharged her. They discharged her here for the comments she made hanging up on the supervisor. So we don't consider the fact she has this past history. We just consider whether the alleged abusive language and the hang-up. Right. And I don't  there's any further confusion on that point. I'll go back  Justice Myerscough's question about the four cases that Pialetti cited in the appellant's brief. But the authority states that an argument with a supervisor in a flurry of temper is not misconduct, though may be cause for discharge. In those cases there was no profanity and the response by the employee was not in response to a supervisor's directive to do something as it was here. The Carroll case at page 693 does note that a single incident of insubordinate behavior constitutes or can constitute misconduct. And though this was in a private conversation with her supervisor, it was still a deliberate disregard for her employer's authority and lack of respect to her supervisor. Misconduct need not occur in the presence of others outside of a private interaction with their supervisor. If that was so, the employee could insulate herself by engaging purposefully in a private interaction with her supervisor away from others. An employer with one employee could never discharge the employee for misconduct in that case. An employee can still disregard the authority and lack of respect to her superior in a private conversation, especially as it was here in regard to her supervisor's directive to come in and talk to him and  her. I'll address the Carroll case as well. Plaintiff Pioletti seems to claim that her language was not profane enough and that's what the Carroll case stands for. I'll direct the court that the Carroll case did affirm the Board of Review's decision that found that that employee committed misconduct and was ineligible for benefits. But there was a lot more to that behavior than disappears. You know, I think it was very, I would disagree, I think it's very similar. In that case, in response to, and the court was clear, they said there was this whole insubordinate attitude with that employee. And in response to the supervisor's comments about his poor job performance, that employee said he didn't need to hear this bullshit. And then challenged the supervisor's authority to fire him. I think that's very similar to ours. When the supervisor calls Pioletti, come to work early, we have a disciplinary matter we need to discuss, you need to sign a disciplinary action form, this is bullshit, hung up the phone, never meets with him about the discipline. I think it's very similar to Carol. The Piggly Weebly case out of Virginia was clear to state that that was just about looking at the facts of that one employee's resignation, something with the employee's efforts to help unionize the work at that grocery store. So it's as if the employer was kind of poking at him during this meeting. So that would distinguish the Piggly Weebly case, and the Piggly Weebly case did say you need to look at all of the circumstances in relation to what was said at the time the propane comment was made. Ms. Shelstrom, you keep bringing up that she never went and talked to the employer about the disciplinary matter he called about in relation to the day of the phone call. When did she go in? What does the record show? When did she go in to see her boss? She claims that it was, I think, a day later. No, I believe she claims it was the same day later that afternoon, and I believe Loveless didn't, I don't know that Loveless specified when she came in. It was either that afternoon or the next day. That would be fair. And when she got there, she apologized to him. Did he tell her he was going to discharge her for the insubordination? At some point during that meeting he did. He was going to recommend it to the school board. That she be discharged because of saying bullshit hanging out with him. So I  that's fair. I'm not sure why you're relying on that. The board of review found that as a basis, but I think even if you take that away and determined that that was improper or not a proper basis. She did go in. He could have talked to her about anything he wanted to. And I would say she could have brought it up as well knowing what she knew from the phone conversation. But I would say even if you want to disregard that third, you've still got the in response to the supervisor's directive, profane statement was made, profane statement was repeated, hung up on the phone. Council spent time on factual findings that the board made, and I'd be happy to just go into those real briefly, although I  explained them in my brief regarding the hanging up the phone we addressed before, that Lovelace testified that she did not know what the supervisor did in fact do that, and she denied it, and at best that was a question of fact for the board of review as the fact finder. The characterization that she made repetitive statements was accurate. She indeed repeated the statement when asked. And I believe  she     the supervisor did in fact do that. She did not know what the supervisor did in fact do that. She did not know what the supervisor did in fact do  She did not    supervisor did in fact do that. She did not know what the supervisor did in fact do that. And then  did not know what the supervisor did in fact do that. And then she did not know